**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 4:15CR83 |
| | § | |
| DOYLE WILLIAM VANHORN, JR. | § | |

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

On September 15, 2015, the Court held a hearing on Defendant's Motion to Suppress (Dkt. 17). Having considered the evidence presented, the Court recommends that the motion be DENIED.

Defendant is charged in this matter with a violation of 18 U.S.C. § 922(g)(1), felon in possession of a firearm. In his motion, Defendant asks that the Court suppress all physical, documentary and other evidence seized in conjunction with the December 30, 2014 search of his family's residence at 1804 East Park Boulevard in Plano, Texas. While officers were investigating a "popping" noise believed to be a gunshot coming from the home, the officers found a 9 mm handgun and a .38 caliber handgun inside an attached garage which had been converted into a room in which Defendant lived.

Defendant argues that the search was a violation of his Fourth Amendment rights because it was without a warrant, without probable cause, without consent, and without any exception to the warrant requirements. The Government has filed a response in opposition.

## Evidence Presented

*Officer Jonathan Theis*

At the hearing, the Government offered the testimony of Jonathan Theis, a patrol officer with the Plano Police Department. Theis testified that, on December 30, 2014, he responded to a call about a hit and run traffic accident and located a crashed vehicle in a church parking lot. While he was in the parking lot, Theis testified, he heard a disturbance approximately 100 yards away. According to Theis, he heard yelling, screaming, and a loud pop he believed to be a gunshot.

Theis testified that he called in for backup, and Officer Tran arrived. According to Theis, they stood by the sidewalk when the front door to Defendant's family's home opened and a man screamed "f*** the police" and slammed the glass storm door shut. More yelling came from inside, and Theis and Tran went to investigate the disturbance.

Theis testified that he saw blood smeared on the glass storm door and around the door, and Tran opened the door. Upon entering the house, officers saw blood on the floor and walls in a hallway and holes punched in the walls near the entry. According to Theis, the house was in disarray, and such was supported by admitted photographic evidence. As the officers went further into the house, Theis testified, he saw blood in the kitchen, the family room, and the curtains on a door leading into the backyard. Everyone in the family was apparently covered in blood.

Theis saw the man who had screamed out the door. He was shirtless and covered in blood and was later identified as Defendant's brother, Dylan Greer. Theis then saw Defendant's father and mother who also had blood on them.

According to Theis, Defendant had blood on his face and arms and was not wearing a shirt. Defendant took an aggressive stance towards officers, went into another room, and did not obey officers' orders to come out. Defendant's mom indicated that there were children in the room and she was able to get Defendant to come out. Defendant had a knife tucked into his waistband but made no attempt to reach for it. Defendant was subsequently handcuffed and removed from the house.

According to Theis, officers continued their investigation into the scene after Defendant was handcuffed because of the amount of blood they observed. Theis testified that they were looking for more victims.

Theis testified that he then followed a trail of blood from the exterior front door down to the driveway and leading to a separate exterior door to a converted garage which adjoined the house. Theis observed a spent .45 caliber shell casing on the ground by the garage door and additional blood on the ground and garage door.

Theis testified that he had not yet seen any gunshot wounds and remained concerned that there were additional people involved when he saw the spent shell casing. According to Theis, the converted garage had a separate entry door which was ajar with a broken door frame. Theis testified that this door was breached prior to the officers' arrival. Theis conceded that he could not see into the the room clearly even though door was partially open.

Using a flashlight and following the trail of blood, Theis entered the room to see if anyone inside had been shot. After Officer Evans joined him to look in the room, Theis saw more blood

inside the room, including blood on the blinds and the interior of the door jam. Theis followed another blood trail around the bed to see if anyone had been shot and needed assistance.

Theis testified that he then saw on a table, in plain view, a semi automatic 9 mm handgun on top of a shirt with blood on it. Theis then saw, in an open safe and in plain view, a .38 caliber weapon and a magazine for a .45 caliber weapon.

Theis testified that the scene was chaotic and that the blood throughout the scene appeared to be fresh. Theis testified that officer never found any shooting victims and that the only injury at the scene appears to have been that on Defendant's hand.

Theis conceded that he did not have consent to go into the house and that he did not hear any screaming from the garage but that he heard a lot of screaming from inside the house.

*Doyle Vanhorn, Sr.*

Defendant called Doyle Vanhorn, Sr., Defendant's father. Vanhorn testified that, on December 30, 2014, police came into the residence at 1804 East Park Boulevard and that no one consented for them to enter the house, search the house, or enter or search the converted garage. Vanhorn, Sr. testified that Defendant and his brother became intoxicated that night, and, at some point, Defendant cut his hand by hitting it on a mirror. According to Vanhorn, Sr., Defendant and his brother were intoxicated but never got into a physical altercation inside the house. He testified that they were cheerful and drunk when they first came home and then their sister became "belligerent" and it "got chaotic", and they started cursing, hitting walls, and busting mirrors. According to Vanhorn, Sr., Defendant bled from the injury all over the house and all of the blood

4

in the interior and exterior of the house came from Defendant's finger. Vanhorn, Sr. testified that he was not afraid for his safety and that he got blood on him because his son was crying and hugging him.

According to Vanhorn, Sr., the converted garage had no overhead lights. Vanhorn, Sr. further testified that, to his knowledge, the garage door was not broken prior to police officers' arrival. Vanhorn, Sr. testified that he did not hear a loud pop on that evening but that he did tell officers about the loud noise of some tires screeching. Vanhorn, Sr. testified that he had no idea where the spent shell casing outside came from or how it got there.

*Doyle Vanhorn, Jr.*

Defendant also testified for the limited purpose of the hearing. According to Defendant, he was the only person who lived in the converted garage.

Defendant testified that, when officers arrived, he was attempting to use the restroom and was scared. Defendant testified that his brother was acting crazy and he was "p**** off" and drunk. Defendant testified that he slipped while wearing new boots, cut his hand trying to catch himself on a mirror, and then punched a wall because he was angry that he slipped. As to a hole in the wall where there was no blood, Defendant testified that he must have fallen into the wall rather than punching it.

Defendant testified that he went to the converted garage to get a rag to wrap around his hand and to get his phone. According to Defendant, the door to the garage was closed when officers arrived and he did not break the door frame. Defendant testified that he did not know where the shell

casing outside the door came from.

According to Defendant, there was no overhead light switch in the garage and he only had a clip-on light to use. Defendant conceded that both of the guns that were found that night were his, but testified that neither was in plain view in his room. According to Defendant, the gun safe was closed and covered by a mirror. Defendant further testified that the other gun seized was not in plain view but could not remember where it was.

Defendant testified that all of the blood observed at the scene came from him and that he did not stop bleeding until the wound was stitched up at the hospital. According to Defendant, he did not consent for officers to come into residence or the garage.

*Photographs and Recordings*

The Government offered photographs of the vehicle and crash site. The Government also offered photographs of the exterior and interior of the house to evidence the disarray observed by officers, as well as the audio recordings of radio traffic and officers' body mics from the night of December 30, 2014. The Government also offered photographs of the blood around the exterior of the garage area and of the shell casing outside the garage, as well as photographs of the various blood spots throughout the interior of the garage room and a photograph of a gun on top of a bloody cloth. The Government also offered photographs of the bloody cut on Defendant's hands.

**ANALYSIS**

As a preliminary matter, the Court first finds that there were sufficient exigent circumstances to justify the warrantless entry onto the property. *United States v. Albarado*, 555 F. App'x 353, 356

(5th Cir. 2014). "As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained." *United States v. Menchaca–Castruita,* 587 F.3d 283, 289 (5th Cir. 2009). A reviewing court must consider the circumstances objectively as they would appear to a reasonable and prudent person. *United States v. Troop,* 514 F.3d 405, 409 (5th Cir. 2008). When reasonable minds may disagree, however, a court should "not second guess the judgement of experienced law enforcement officers concerning the risks of a particular situation." *Menchaca–Castruita,* 587 F.3d at 290 (internal quotation marks and citation omitted).

Here, the Court finds more than sufficient evidence of exigent circumstances. Theis testified that officers went to the house because there was an obvious disturbance occurring and he believed there were exigent circumstances to enter. Theis testified that he believed there were hurt people inside the house given the amount of blood observed and screaming heard.

A reasonably prudent person hearing a loud pop believed to be a gunshot, hearing an individual yelling out obscenities from the direction of the pop along with other screaming, and observing fresh blood would have believed there was an altercation in progress. The photographs of the interior of the home evidence significant blood and damage throughout the home. Even in the photographs, the blood appears wet and is evidently fresh. Further, the recordings from the officers' body mics evidence a clearly heightened and emotional situation, which even Defendant's father described as chaotic. That all of the blood was later determined to have come from a cut finger does

not mean that officers lacked a reasonable ground to suspect a more serious injury. Therefore, although it appears undisputed that no consent was given for officers to enter the house (and although Defendant and his family now seek to characterize the fight as a verbal argument coupled with an accidental cut rather than a physical altercation), there were sufficient exigent circumstances to justify the officers immediate entry into the home.

The Court finds that Defendant's account of his injuries and conduct is not supported by the photographic or recorded evidence. On cross-examination, when Defendant was not able to demonstrate on any photographs any broken glass on which he claimed to have cut his hand, he instead testified that he cut his hand on the metal edge of a mirror. The Court notes that no blood can be observed on the metal mirror frame. Defendant's testimony was not credible. But, even if his account of the events were true, such does not change the Court's analysis as to officers' objectively reasonable perception of the scene. There were sufficient exigent circumstances to justify the officers' warrantless entry into the home.

The Court next turns to Defendant's challenge of officers' continued search into the converted garage. The Court finds that officers' search was well within the protective sweep doctrine.

The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of officers and others present at the scene. *United States v. Rodriguez*, 601 F.3d 402, 405 (5th Cir. 2010). Critically, a protective sweep is not a full search of the premises and "may extend only to a cursory inspection of those spaces where a person

may be found." *Maryland v. Buie*, 494 U.S. 325, 335, 110 S. Ct. 1093, 1099, 108 L. Ed. 2d 276 (1990). As explained by the United States Supreme Court:

> We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334.

Thus, to be constitutionally valid, (1) the police must not have entered (or remained in) the home illegally and their presence within it must be for a legitimate law enforcement purpose; (2) the protective sweep must be supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the legitimate protective sweep may not be a full search but may be no more than a cursory inspection of those spaces where a person may be found; and (4) the protective sweep may last no longer than is necessary to dispel the reasonable suspicion of danger, and no longer than the police are justified in remaining on the premises. *Rodriguez*, 601 F.3d at 405-406. A court should consider the totality of the circumstances surrounding the officers' actions in determining whether an officer had a reasonable, articulable suspicion sufficient to justify a protective sweep. *Id.* at 406.

Theis' following of the blood trail to look for other individuals had a legitimate law enforcement purposes and it was reasonable for Theis and other officers to suspect that an individual who had been shot (or who had shot someone else) was inside the converted garage. Theis' sweep

9

of the converted garage extended only to a cursory inspection of those spaces of the room where a person – injured or otherwise – could be found. And the weapons seized – weapons Defendant has conceded were his – were found in plain view.

Given the totality of the circumstances here: that officer Theis heard a weapon fire, observed a significant amount of blood inside and outside the house, and observed blood and a shell casing outside the garage, the Court finds that officers' protective sweep of the converted garage for injured people or perpetrators was justified. *United States v. Montanya*, 425 F. App'x 392 (5th Cir. 2011) (police officers were justified in conducting a protective sweep of garage, once they saw the defendant through open garage door throw an apparent weapon under car in the garage).

The Court further finds that the officers' protective sweep of the house and garage covered no more than those spaces where the officers' reasonably suspected that a person posing danger could be found and lasted no longer than necessary to dispel the suspicion of danger. *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010). Photographs clearly show a broken door jam with blood on it, and Defendant's claim that officers breached the door is simply not credible.

As to Defendant's testimony that the door to the room was not breached by him and that the firearms seized were not in plain view, it is also not credible or supported by the objective evidence. Defendant was unable to explain the blood on the inside of the door jam, the blood on the inside of the gunsafe he claims was closed when officers arrived, or the blood on the firearm he stated was not in plain view.

Officers were entitled to follow the trail of blood into the garage to dispel the suspicion of someone inside having been injured by or continuing to use a firearm. The blood led to the weapons which were in plain view. There are no grounds to suppress their seizure.

For these reasons, the Court recommends that Defendant's Motion to Suppress (Dkt. 17) be DENIED.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C.A. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 21st day of September, 2015.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE